93 P.3d 1061

**STATE of Arizona, Appellee,**

v.

**Shad Daniel ARMSTRONG, Appellant.**

**No. CR–00–0595–AP.**

Supreme Court of Arizona, En Banc.

July 15, 2004.

Janet A. Napolitano, former Arizona Attorney General, Terry Goddard, Arizona Attorney General by Kent Cattani, Chief Counsel, Capital Litigation Section, Phoenix, and Donna J. Lam, Assistant Attorney General, Tucson, Attorneys for Appellee.

Harriette P. Levitt, Tucson, Attorney for Appellant.

## OPINION

JONES, Chief Justice.

¶ 1 Shad Daniel Armstrong was convicted March 10, 2000 of two counts of first degree murder and one count of conspiracy to commit murder. Following an aggravation/mitigation hearing, the trial judge sentenced Armstrong to death for each of the two murders and twenty-five years to life for the conspiracy conviction. A mandatory Notice of Appeal was filed under Arizona Rule of Criminal Procedure 31.2(b). This court exercises jurisdiction pursuant to Article 6, Section 5(3), of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") sections 13–4031 and –4033(A) (2001). For the reasons that follow, we affirm Armstrong's convictions.

### FACTS[1]

¶ 2 In late August 1996, Armstrong lived in Oklahoma with his girlfriend, Rusty Medina. During that month, Armstrong, his sister Farrah, and a friend, Tommy Taylor, burglarized the home of Rob Fisher in Caddo, Texas. Sometime during the next four months, Armstrong learned that Taylor had implicated him in the burglary. He left Oklahoma in January 1997 in order to avoid arrest. He, along with Medina, Medina's child K.M., and Farrah relocated to Tucson, Arizona, where they moved into an apartment together.

¶ 3 Soon after arriving in Tucson, Farrah met Frank Williams and almost immediately

---

1.  We view the facts in the light most favorable to sustaining the verdict. *State v. Gallegos,* 178 Ariz. 1, 9, 870 P.2d 1097, 1105 (1994).

began a romantic relationship with him. Shortly thereafter, Williams moved into the apartment where Armstrong, Medina, K.M., and Farrah were living. Ultimately, Farrah and Williams got engaged, and in July 1997 moved into their own apartment. By December, however, Armstrong, Medina, K.M., and a child born to Medina and Armstrong in May 1997 had left their apartment and moved in with Farrah and Williams.

¶4 In January 1998, Armstrong and Medina began to quarrel, so Armstrong moved to Three Points, Arizona with his friend David Doogan and his father, Tim Doogan, into the Doogans' trailer. Medina and the children remained at the apartment a few more weeks until early February, when they moved out and joined Armstrong in Three Points.

¶5 Meanwhile, in late January 1998, Farrah and Williams visited Farrah's parents in Oklahoma. During this trip, Farrah indicated to her parents that she planned to marry Williams and she wanted to resolve her legal problems in Oklahoma so that she could move back to the state. Farrah asked her parents to ascertain whom she should contact, but before obtaining the information, Farrah and Williams left Oklahoma to return to Arizona. Farrah's mother called the apartment in Arizona and left the Oklahoma district attorney's phone number with Armstrong. Upon arriving home, Farrah shared with Medina her plans to turn herself in. Farrah told Medina that the only way she could achieve a fresh start was by going back to Oklahoma, turning herself in, and telling the authorities of Armstrong's whereabouts. Medina called Armstrong and told him of Farrah's plan to "turn him in for his warrants[,] to clean her slate, to get everything off her back." Armstrong told Medina that he was "going to have to do something about it" because he did not want either of them to go to prison or lose their kids. Against this background, Armstrong began to lay plans to kill Farrah and Williams.

¶6 In early February 1998, Armstrong told David Doogan that Farrah had talked to him about turning herself in because she had been told that she would receive a break on the charges she was facing if she disclosed Armstrong's location. Armstrong told Doo-gan he felt Williams was influencing Farrah to turn herself in and that he intended to kill Williams in order to exert control over Farrah. Armstrong and Doogan then contrived a scheme to invite Williams over to work on Doogan's car and then shoot him while driving down the road. This plan was never pursued.

¶7 Armstrong and Doogan also had a number of conversations about how they would murder both Farrah and Williams. They decided to dig a grave on Doogan's property, believing that nobody would think to look for the bodies there. They dug the grave about one week before the murders.

¶8 Armstrong later came up with a different plan to kill Farrah and Williams. He planned to lure Farrah to the Doogan property under the pretext of getting her a puppy from his friend who lived nearby. Once she got there, he would invite her to go with him to look at a snake in a small trailer on the property. Outside the trailer, he would shoot her from behind with a gun hidden behind the back door. After shooting Farrah, Armstrong planned to lure Williams to the Doogan property under the pretext of having him work on Doogan's car. Armstrong would then shoot him, too.

¶9 Armstrong came closer to carrying out his second scheme. He called Farrah and she came to the trailer. They went outside to look at the snake, but as Armstrong reached for the shotgun, Farrah turned around and asked him what the gun was for. He told her he was bringing the gun just in case they needed it for the snake. She said if he needed the gun, she did not want to see the snake, and they went back in the trailer.

¶10 On February 18, 1998, Armstrong and Doogan made a third plan to kill Farrah and Williams. In the early afternoon of February 19, Armstrong and Doogan began to prepare. This time, Armstrong called Farrah between 4 and 5 p.m. and asked her to come to the Doogan property to collect money he owed her. He told Farrah to have Williams come as well to help work on Doogan's car.

¶11 Armstrong and Doogan next prepared the scene for Farrah and Williams' arrival by

hanging sheets on the walls to capture any blood spatter, placing a blanket in the living room, sliding the coffee table out of the way, and gathering plastic bags that they planned to use to cover the victims' upper bodies after the shooting. Armstrong then removed ammunition from a cabinet in the kitchen and loaded the shotgun. The two men then waited for Farrah and Williams for an hour or two.

¶ 12 Farrah and Williams arrived at the Doogan property some time around dusk. As they approached the trailer, Doogan opened the front door and stood in the doorway while Armstrong hid behind the front door with the shotgun. Although the original plan had been that Armstrong would immediately shoot Farrah and Williams, Doogan waved Armstrong off as the couple walked up the front steps. Armstrong stepped away from the door and walked down the hallway and placed the gun in a room. Eventually, the four congregated in the living room, with Williams seated on the recliner, Farrah on the couch, and Doogan in a chair opposite the recliner. Armstrong remained standing, moving around much of the time. After a few moments, Armstrong headed down the hallway. He returned momentarily carrying the shotgun and stopped about two and a half feet in front of Williams. Williams cursed at Armstrong and started to get up, but Armstrong shot him in the midsection before he could stand. Farrah screamed and also started to get up, but Armstrong turned and shot her once in the midsection, followed by another shot to the head. Armstrong then turned back to Williams and shot him in the head.

¶ 13 After the shooting, Armstrong and Doogan spread the blanket on the floor and moved the victims' bodies onto it. They put plastic bags over their upper bodies to keep any smell from rising out of the gravesite. Armstrong removed some of Farrah's jewelry and went through Williams' pockets. They tied knots in each end of the blanket and dragged the bodies out the back door onto the back porch, leaving a bloody streak on the kitchen floor. They hooked one end of the blanket to the back of Farrah's truck and pulled the bodies to the gravesite. After

pushing the bodies into the grave, Armstrong and Doogan partially filled the hole with dirt. They returned to the trailer and took the bloody couch and recliner and loaded them into the truck. Armstrong then gathered the sheets and rags used to clean up the bloody mess, disposed of them in the partially filled grave, and filled the remainder of the hole with dirt.

¶ 14 Meanwhile, Medina, with her children, had been in a travel trailer also located on the Doogan's property while the murders were taking place. Shortly after Armstrong returned from filling the grave, Medina left the children in the travel trailer and entered the main trailer through the back door. She saw Doogan washing his hands in the kitchen sink. As she walked back toward the bathroom, she saw the blood trail through the kitchen, as well as the blood stains and pieces of flesh in the living room. Medina found Armstrong in the bathroom, washing off bloody jewelry and money. Armstrong said, "I did it," and explained that he had shot the victims in the head and chest. Armstrong then spent much of that night and the next day covering up the murders by cleaning the trailer of the remaining blood and carnage, as well as disposing of the bloody furniture in the desert.

¶ 15 Soon after the murders, Farrah's and Williams' disappearance began to be the subject of an investigation by law enforcement. As a result, Armstrong took Medina and the children and fled Arizona in an effort to evade questioning by the authorities. Armstrong took his family to Los Angeles where they stayed for seven to eight months. It was there that Armstrong first expressed emotion to Medina over the loss of his sister and Williams and proceeded to explain to her in detail what had happened. He also told her that if they were ever caught, she should tell the police that Doogan and Farrah had been having a "fling," that Doogan did not like Williams because Williams had gotten him fired from a job, and that Doogan was the one who shot the victims.

¶ 16 Meanwhile, back in Arizona the investigation into the disappearance continued. As a result of the investigation, the police found the bloody furniture from Doogan's

trailer that Armstrong and Doogan had dumped in the desert. Also, in June 1998, Doogan gave a statement in which he confessed to limited participation in the two murders. Doogan claimed that when he came home on February 19, Armstrong had already murdered the victims and buried them behind the house. Doogan went with police to the Doogan property, showed them the location of the gravesite, and had a conversation with them about the location of the blood stains in the living room. Detective Downing and the homicide detail searched the home and property pursuant to a warrant. After four to five hours of excavation, the police located the victims' bodies, along with sheets, rags, and a pair of Armstrong's blue jeans. A warrant for the arrest of Armstrong and Medina issued on June 16, 1998.

¶ 17 In early December 1998, Armstrong, Medina, and the children left Los Angeles and moved to Odessa, Texas, where they lived together on and off. During this time, Medina worked as an exotic dancer and Armstrong stayed home with the children. While watching television on January 9, 1999, Armstrong saw the story of Farrah's and Williams' murders on "America's Most Wanted." Armstrong called Medina and described the contents of the show to her, including a re-enactment of his actions and involvement. Armstrong wanted to leave Odessa; Medina refused to go.

¶ 18 Approximately one week later, on January 16, Medina again left Armstrong after an argument about her job as a stripper. Medina took the children to the home of a friend, where that evening she was arrested. She told police where she had last seen Armstrong, went with them in the patrol car to the location, and then was taken to jail.

¶ 19 At 3 a.m. on January 18, 1999, the police arrested Armstrong, finding him sleeping on the laundry room floor of an Odessa apartment complex. While being transported in the patrol car, Armstrong volunteered that he had planned to leave Odessa for Dallas, but once he learned of Medina's arrest he had decided to turn himself in the following day.

¶ 20 On January 20, 1999, Armstrong initiated a conversation with Officer Michael McCleery after signing a waiver of extradition to Arizona. Armstrong told McCleery that he and Medina had argued about turning themselves in; he claimed they had separated because he wanted to surrender, but she did not. He also told the officer that he did not want Medina "to take the rap for something that he had done" and that he knew he would get the death penalty for what he had done.

¶ 21 Armstrong, Medina, and Doogan were charged with two counts of first degree murder and one count of conspiracy to commit murder. On March 8, 1999, the State filed its notice of intent to seek the death penalty. On August 27, 1999, Doogan announced he would accept the State's plea offer of two counts of second degree murder in exchange for his testimony at trial. On October 14, 1999, the State sought to sever Armstrong's and Medina's trials because the prosecutor hoped to use Medina's statements against Armstrong. The trial judge granted the State's motion.

¶ 22 On January 5, 2000, the State announced Medina would accept a plea bargain in exchange for her testimony at trial. The trial court seated the jury on January 11, 2000, and then postponed the first day of trial until January 24, 2000. Following a thirty-three day trial, Armstrong was convicted on all charges. The court imposed the death penalty for each of the two murders and twenty-five years to life for the conspiracy conviction. This appeal followed.

## DISCUSSION

¶ 23 Armstrong's only contention on appeal is that his convictions should be reversed because of misconduct on the part of the prosecutor, Susan Eazer. We will address each instance of alleged misconduct separately.

### A. Bad Faith/Late Disclosure of Witness

¶ 24 On the eve of trial, the State announced it had entered into a plea agreement with Medina, a condition of which required

Medina to testify against Armstrong. Armstrong contends that Eazer proposed the agreement in bad faith, waiting until the last minute to offer Medina a plea to gain a tactical advantage over Armstrong's defense. Armstrong further contends that by failing to disclose the plea agreement sooner, Eazer committed a disclosure violation that the court should have sanctioned by precluding Medina's testimony. Armstrong argues that he suffered prejudice as a result of Eazer's actions and, given the alleged bad faith, the appropriate remedy is reversal.

### 1. Background

¶ 25 Initially, Armstrong and Medina were to be tried together. In October 1999, Eazer sought to sever their trials in order to use Medina's post-arrest statement[2] against Armstrong at trial. The judge questioned whether Medina might receive a plea bargain. Medina's counsel, David Darby, acknowledged that the State had offered a plea of second degree murder, which Medina had rejected. She had countered with a plea to hindering prosecution, but the county attorney's homicide panel rejected it. The trial court set Armstrong's case for trial on November 2, 1999. The State filed a notice of intent to use all statements made by all three defendants. Armstrong objected to the use of Medina's post-arrest statement, claiming that the statement violated his Sixth Amendment right to confrontation under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

¶ 26 Over the next two months the court held numerous hearings and status conferences. On several occasions, the judge expressed skepticism that the State would proceed against Medina and questioned whether she might receive a plea. Each time both Eazer and Darby maintained that Medina

refused to accept a second degree murder plea and the State was not willing to lower the plea to hindering prosecution. Meanwhile, Eazer moved to continue the trial to early January 2000, claiming she needed three to four weeks to address personal health matters. The judge granted the motion, and the trial was rescheduled for the first week of January 2000. On December 17, 1999, however, the court found that Medina's post-arrest statement was inadmissible.

¶ 27 On January 5, 2000, Eazer announced that Medina had agreed to a plea and would be called as a witness against Armstrong. The plea agreement required Medina to plead guilty to one count of trafficking in stolen property, a class 3 felony, and one count of facilitation to commit murder, a class 5 felony, with no probation available. The court questioned Eazer about the timing of the plea agreement due to its close proximity to the trial date. Eazer explained that after the December 17 ruling precluding the use of Medina's post-arrest statement, she began to reevaluate the strength of her case against Medina. Eazer discussed her concerns with her supervisor on December 20. At his suggestion, she met with a homicide panel on the next available date, December 27. The panel advised Eazer that before she continued with plea negotiations, she should seek an additional charge of trafficking in stolen property from the grand jury. Eazer spoke to Medina's counsel on Monday, January 3, and asked if Medina would be willing to plead to trafficking in stolen property and facilitation to commit murder. On the morning of Wednesday, January 5, Darby told Eazer that Medina would be willing to plead to those two felony counts. With this information, Eazer convened an impromptu homicide panel over the lunch hour and presented them with the proposed plea. The panel

2. Medina gave several statements to the police, the prosecutor, and defense counsel. Immediately following her arrest, Medina cooperated with the Texas police and told them where she had last seen Armstrong. On January 18, while still detained in Texas, she gave an extensive audio-taped statement to Detective C.J. Downing of the Pima County Sheriff's Department (the "post-arrest statement"). That same day, Medina gave a three-minute statement to America's Most Wanted, with Detectives Downing and Gamber,

and J.J. Armstrong present. In April 1999, Medina gave a video-taped "free talk" to Eazer with Medina's attorney present; defense counsel for Armstrong was not present. Following disclosure of Medina's plea agreement in January 2000, she gave two additional interviews with Eazer and Armstrong's defense counsel present. The January 18, 1999 post-arrest statement is the one Eazer sought to admit into evidence at Armstrong's trial.

approved the plea offer, and Eazer called Darby early that afternoon to inform him that the State would offer Medina a plea in exchange for her testimony.

¶ 28 Armstrong contended that Eazer acted in bad faith in disclosing Medina at such a late date and sought, as possible sanctions, either preclusion of Medina's testimony or a continuance. Additionally, Armstrong sought to strike the venire panel because the statement of facts in the jury questionnaire had not contemplated Medina's testimony in the trial and included a defense that Armstrong might no longer use.

¶ 29 On January 6, the trial court held a hearing on Armstrong's motion and found no willful misconduct or bad faith. The judge based this finding on his belief that Eazer realistically needed to reevaluate her trial strategy after Medina's statement was found inadmissible. She knew the case against Armstrong was not as strong without the statement. The court proceeded with jury selection over the next few days, seated a twenty-person jury over Armstrong's objection, and continued the start date of the trial for two weeks.[3] After several hearings on the issue, the judge found no grounds for preclusion of Medina's testimony and denied Armstrong's motion.

## 2. Bad Faith Claim

■ ¶ 30 Armstrong contends the trial court erred when it found that Eazer did not act in bad faith in negotiating a plea agreement with Medina. Armstrong asserts that "[a] plea agreement with Medina should have been reached much sooner, if the prosecutor was acting in good faith."

■ ¶ 31 In *Pool v. Superior Court*, this court noted that a trial judge's "finding with respect to prosecutorial intent must be based primarily upon the objective facts and circumstances shown in the record." 139 Ariz. 98, 106–07, 677 P.2d 261, 269–70 (1984); *see*

*also Oregon v. Kennedy*, 456 U.S. 667, 680, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982) (Powell, J., concurring).

¶ 32 Armstrong contends the trial judge applied a subjective, rather than objective, standard in determining Eazer's intent. However, the objective facts in the record and the circumstances under which the State entered into the last-minute plea agreement with Medina support the trial judge's finding that Eazer did not act in bad faith or engage in willful misconduct. Instead, Eazer justifiably reevaluated her strategy after receiving the adverse ruling regarding the admissibility of Medina's post-arrest statement. Armstrong asserts that Eazer knew nine months before trial that Medina was willing to accept a plea in exchange for testimony. However, Medina's attorney told the court on several occasions that Medina would not accept the specific terms of plea agreements previously offered.

¶ 33 The trial judge's finding is further bolstered by his reliance on *State v. Dickens*, 187 Ariz. 1, 926 P.2d 468 (1996). There, the issue was whether the trial court erred when it allowed the State to reopen its case-in-chief to present the testimony of a codefendant who agreed to testify against the defendant in exchange for a plea. *Id.* at 12, 926 P.2d at 479. Dickens was charged with felony murder. Four months before trial, the State had disclosed all significant information it had on Dickens' co-perpetrator, Amaral, anticipating that he would be testifying against Dickens. *Id.* at 11, 926 P.2d at 478. Less than two weeks before trial, Amaral signed a plea agreement in which he agreed to testify. A few days later, Amaral changed his mind and withdrew from the agreement. The State presented its case without Amaral's testimony. After the State rested, but before Dickens presented any evidence, Amaral approached the prosecutor and offered to testify in exchange for the original plea agreement. The following morning the

---

**3.** At the initial bad-faith hearing, the judge stated: "I made no definite decision about what to do reference a continuance, whether there will be a continuance of the trial itself. What I am leaning toward given the holding and the actual case of *Dickens* [is to allow] defense counsel without [sic] trial to interview Medina, to re-

interview Doogan, and other people.... [T]here's a good chance, possible chance too we won't start probably until the 18th of January." On January 10, he put the parties on notice that January 19 was the possible start date. The following day, the judge moved the date to January 24 to give defense counsel additional time.

State moved to reopen its case so that Amaral could testify. The judge granted the motion and ordered a one-week recess to allow Dickens to take Amaral's deposition and prepare for his testimony. *Id.* Dickens was convicted and sentenced to death. *Id.* at 8, 926 P.2d at 475.

¶ 34 On appeal to this court, Dickens argued that the trial court erred when it granted the State's motion to reopen because his defense had been structured on the belief that the co-perpetrator, Amaral, would not testify. *Id.* at 12, 926 P.2d at 479. Specifically, Dickens argued that "the [S]tate acted in bad faith by advising the defense at the beginning of the trial that Amaral would not testify and then waiting until the end of the trial to offer a deal once the prosecutor decided that Amaral's testimony was needed for a conviction." *Id.*

¶ 35 This court held that the record did not support Dickens' allegations of intentional misrepresentation or bad faith. *Id.* While the prosecutor's decision to present the co-perpetrator's testimony "certainly hurt Defendant's case, . . . such damage does not equate to bad faith." *Id.* The court emphasized that "[t]he [S]tate gained no unfair tactical advantage when it moved to reopen because the defense had not yet presented any evidence in reliance on the [S]tate's case-in-chief." *Id.* The one-week continuance provided "ample time to prepare for [the co-perpetrator's] testimony." *Id.*

¶ 36 Similarly, while Medina's last-minute plea agreement affected Armstrong's trial strategy, such damage does not of itself signal prosecutorial bad faith. *Cf. State v. Dumaine,* 162 Ariz. 392, 401, 783 P.2d 1184, 1193 (1989) ("[N]o prosecutorial misconduct occurs where the prosecutor merely arranges a favorable plea agreement with one of the several witnesses testifying against the defendant."). Moreover, the prosecutor's actions here had less potential to do harm than in *Dickens* because neither side had presented evidence, the trial court granted a two-week continuance, and the State agreed to cooperate in finding necessary witnesses to help defense counsel prepare. We therefore conclude that the trial judge was within his discretion in finding that Eazer did not act in bad faith or engage in willful misconduct.

**3. Alleged Discovery Violation**

■ ¶ 37 Armstrong contends that the last-minute disclosure of Medina as a witness was a discovery violation and that the trial court erred when it did not preclude Medina from testifying. We find, however, that Medina's eleventh-hour decision to accept a plea and testify does not present a discovery issue and, even assuming there was a violation, Armstrong cannot claim surprise or prejudice.

■ ¶ 38 Arizona Rule of Criminal Procedure 15.1(a)(3) (2003) requires that, as part of pretrial discovery, the prosecutor shall supply to the defendant the names and relevant written or recorded statements of all persons whom the prosecutor will call as witnesses in its case-in-chief. The purpose of this rule is "to give full notification of each side's case-in-chief so as to avoid unnecessary delay and surprise at trial." *State v. Dodds,* 112 Ariz. 100, 102, 537 P.2d 970, 972 (1975). If a party fails to comply with this disclosure provision, the court may impose any remedy or sanction it finds just under the circumstances, including but not limited to granting a continuance and precluding a party from calling the witness. Ariz. R.Crim. P. 15.7 (2004).

¶ 39 We conclude the State did not violate Rule 15.1. The belated disclosure of Medina as a witness was a result of her last-minute decision to enter into a plea agreement in exchange for her testimony. Where, as here, a codefendant is listed as a co-indictee and the codefendant agrees to a plea arrangement in exchange for her testimony, as long as the prosecutor takes reasonable steps to notify the defendant quickly of the new witness there is no disclosure violation under Rule 15.1. *Accord Lingerfelt v. State,* 238 Ga. 355, 233 S.E.2d 356, 360 (1977); *People v. Schutz,* 201 Ill.App.3d 154, 147 Ill.Dec. 289, 559 N.E.2d 289, 293 (1990).

■ ¶ 40 Even assuming *arguendo* a disclosure violation, the court would have to determine the appropriateness of the remedy. This court previously has held that "[i]mposing sanctions for non-disclosure is a

matter to be resolved in the sound discretion of the trial judge, and that decision should not be disturbed absent a clear abuse of discretion." *State v. Hill,* 174 Ariz. 313, 325, 848 P.2d 1375, 1387 (1993) (citing *State v. Martinez–Villareal,* 145 Ariz. 441, 448, 702 P.2d 670, 677 (1985)). We will not find that a trial court has abused its discretion unless no reasonable judge would have reached the same result under the circumstances. *State v. Chapple,* 135 Ariz. 281, 297 n. 18, 660 P.2d 1208, 1224 n. 18 (1983).

¶ 41 Armstrong argues that preclusion of Medina's testimony would have been the appropriate sanction for the State's disclosure violation. However, in *State v. Schrock,* this court cautioned against preclusion of witness testimony:

> The trial court, however, should seek to apply sanctions that affect the evidence at trial and the merits of the case as little as possible, since the Rules of Criminal Procedure are designed to implement, and not to impede, the fair and speedy determination of cases. Prohibiting the calling of a witness should be invoked only in those cases where other less stringent sanctions are not applicable to effect the ends of justice. . . .
>
> We, therefore, hold that prior to precluding either party's witnesses, as a discovery sanction, the court must make an inquiry into the surrounding circumstances. Failure of the trial court to do so constitutes error. The inquiry should determine if less stringent sanctions can be used. The court should also consider how vital the precluded witness is to the proponent's case, whether the opposing party will be surprised and prejudiced by the witness' testimony, whether the discovery violation

was motivated by bad faith or willfulness, and any other relevant circumstances.

149 Ariz. 433, 436–37, 719 P.2d 1049, 1052–53 (1986) (citing *State v. Smith,* 123 Ariz. 243, 252, 599 P.2d 199, 208 (1979)).

¶ 42 In light of *Schrock,* the trial judge in the instant case did not abuse his discretion in declining to preclude Medina's testimony. There is no doubt that preclusion would have been detrimental to the State's case; Medina provided corroborating testimony about Armstrong's actions before, during, and after the homicides. Additionally, the late disclosure was not motivated by bad faith or willfulness.

■ ¶ 43 Armstrong also cannot complain of surprise or prejudice. Medina was a codefendant whose name was included in Armstrong's indictment. *See Anderson v. State,* 141 Ga.App. 249, 233 S.E.2d 240, 242 (1977) (finding no surprise or prejudice where codefendants testified at trial in exchange for a plea because codefendants' names were listed in defendant's indictment). Armstrong also knew what Medina's testimony would be because he previously had been supplied copies of Medina's post-arrest statement and was immediately provided with a copy of her April 1999 "free talk" when the State announced she would testify.[4] *See id.; People v. Schutz,* 201 Ill.App.3d 154, 147 Ill.Dec. 289, 559 N.E.2d 289, 293 (1990) (finding no surprise where defendant had been supplied copies of codefendant's statement). Finally, the judge's use of a two-week continuance to handle the delayed disclosure was reasonable and cured any prejudice Armstrong may have suffered. *Cf. State v. Hill,* 174 Ariz. 313, 325, 848 P.2d 1375, 1387 (1993) (allowing defendant to postpone his cross-examination of witness whom prosecution had failed to

---

4. Armstrong contends that during a post-disclosure interview on January 9, 2000, Medina admitted for the first time that she was the one who told Armstrong that Farrah was going to turn him in for the Caddo, Texas burglary, thereby establishing a conclusive motive for the State's case. Medina's January 9 statement contradicts her April 1999 free talk, in which she claimed she did not know who had told Armstrong that Farrah was going to turn him in. Even so, the motive for the murder was firmly established by other statements, including Medina's post-arrest statement and the statements of three other wit-

nesses. Medina's change of story may have come as surprise to both Armstrong and the State, but the alleged motive was no surprise. Indeed, as the State points out, defense counsel's cross-examination demonstrated his familiarity with the content and nature of Medina's testimony, which he impeached with prior inconsistent statements. *See State v. Tucker,* 157 Ariz. 433, 440, 759 P.2d 579, 586 (1988) (Defense counsel's cross examination and impeachment of witness demonstrated that content of testimony was not a surprise.).

disclose during discovery was reasonable method of handling nondisclosure). Thus, even assuming a discovery violation, Armstrong suffered no prejudice. There was no error when the trial court declined to preclude Medina's testimony.

## B. The Medina/Armstrong Letters

¶ 44 Armstrong contends that Eazer acted in bad faith by introducing letters that Armstrong wrote to Medina while they both awaited trial in the Pima County Jail. In the alternative, Armstrong accuses the State of failing timely to disclose Armstrong's letters to Medina.

### 1. Background

¶ 45 In direct examination, Medina testified that Armstrong had written letters to her in jail telling her "never to take a plea, never to testify" because if she did, "the kids would get taken away." Armstrong objected to Medina's testimony about the letters' contents, raising hearsay and best evidence objections. Eazer contended the letters were admissible. The court found that Medina's testimony about the missing letters was admissible over Armstrong's objection.

¶ 46 On cross-examination the first issue defense counsel addressed was the letters Medina and Armstrong wrote to one another while in jail. When defense counsel showed Medina letters she had written to Armstrong while in jail, Eazer objected, claiming that Armstrong had never disclosed the letters. Defense counsel contended he found Medi-

na's letters at the last minute in his materials while preparing for Medina's testimony. Defense counsel also said he believed that the letters had been disclosed by Armstrong's first counsel.[5]

¶ 47 Eazer asked that the court not allow defense counsel to cross-examine Medina on the letters until she had a chance to review them. The court refused and allowed the cross-examination to proceed. The State subsequently moved to preclude Medina's letters, contending that defense counsel had not acted on a good faith belief that the letters had been disclosed. The court declined to preclude any of Medina's letters. Defense counsel had Medina read from four letters in which Medina implicated David Doogan as the killer and said she would never take a plea unless it was to testify against Doogan.[6] The State objected when defense counsel moved to admit the letters, and the trial court held its ruling in abeyance.

¶ 48 Following defense counsel's cross-examination of Medina, Medina told Eazer that she had written letters in response to intimidating letters Armstrong had written to her. Medina said to Eazer, "I have his letters, and you will see why I wrote those letters when you see his letters." Medina gave her attorney, Darby, permission to give Armstrong's letters to Eazer, who in turn, disclosed the letters to Armstrong's counsel the following day.

¶ 49 Outside the presence of the jury, Eazer renewed her objection to the admission of

---

**5.** Initially, Armstrong was represented by Lori Lefferts of the Pima County Public Defender's Office. Lefferts moved to be removed from the case due to a potential conflict of interest. The court granted the motion and Kurlander was named as her replacement.

**6.** The quoted portions of the letters read as follows:

Saying the truth will set you, us free. Baby right now that is how I feel about everything, the truth. Believe I'm not going to take a deal unless they come with one for testifying against him. Believe that. I'm not going down for anything his crazy [expletive] has done, bad enough he's put us in a mess we had nothing to do with.
I just hope the DA knows that he's lying and that they need us because they are going to try to get us all for this and we are innocent and

we don't need to go to prison for something he did.
And to think that our lives are going to lay in 12 people's hands for a crime that we did not commit is scaring the hell out of me.
[T]o know that we have to convince 12 people that we had nothing to do with this crime is so hard to grasp.... I could care less to see him because he's the one that took us away from our children and are putting us through this [expletive].... Shad, serious question, if they come to you and ask you turn on me would you save your [expletive]? I wouldn't. I hope you know that I was scared. I just told them what they wanted to hear, but the truth will come out and the guilty one, him [Doogan], will go down for this.

Medina's letters. She challenged the credibility of defense counsel's belief that the exhibits had been disclosed and pointed out that defense counsel refused to disclose the entire stack of letters from which he had pulled the objectionable exhibits, despite the fact that he thought they had all been disclosed previously. Further, Eazer put defense counsel on notice that she would explain the contents of Medina's letters by introducing the newly discovered and recently disclosed letters that Armstrong had written to Medina. Eazer claimed that defense counsel opened the door to the late disclosure by using Medina's letters. The court again held in abeyance its ruling on the admissibility of the letters and asked Eazer to identify which of Armstrong's letters she would seek to use.

¶ 50 The trial court held several additional hearings over the next three and one-half weeks regarding the admissibility of Armstrong's letters. During these hearings, defense counsel admitted he knew that Armstrong had written letters to Medina, but he did not question Medina about the contents of Armstrong's letters because Armstrong had told him the letters contained nothing important. Defense counsel stated he did not believe that Armstrong's letters still existed because the State had not disclosed them. As a remedy for the late disclosure of the letters, defense counsel sought to limit the use of Armstrong's letters to rebuttal of those issues raised in Medina's letters.

¶ 51 Eazer claimed there was no disclosure problem and contended she ought to be able to use Armstrong's letters not only for purposes of rehabilitating Medina's testimony, but also as admissible evidence against Armstrong. She requested permission to reopen her direct examination to address the new information raised in cross-examination. Specifically, she sought to admit letters that dealt with the issue of Armstrong's whereabouts the evening of the murder, claiming that those letters indicated Armstrong's attempt to communicate a "plan" to Medina.

¶ 52 With the exception of some "smut" talk, the court admitted Medina's letters. At Armstrong's request, the trial court went through Armstrong's letters one by one and

initially only admitted those letters that were in rebuttal to Medina's letters, holding in abeyance its ruling on the admissibility of four other letters that might have indicated a "plan." After protracted arguments by both parties, the court found the following:

> [T]here was no disclosure violation by the State pursuant to Rule 15. The Court further finds that pursuant to the Rule 401, these letters [Ex. 67, 74, 81, 96] are relevant. The Court further finds pursuant to 403 that their probative value outweighs any possible substantial prejudice or unfair prejudice to the defendant. The Court believes they're admissible in their entirety, either as rebuttal or as substantive evidence, against the defendant.

> The Court believes that given the nature of the evidence presented . . . the defense has created an unfair impression before this jury as to what the letter[s] meant. And the Court believes, therefore, the jury should have the entire picture of the relationship, and Ms. Medina can further explain why she wrote the letters.

¶ 53 Defense counsel immediately moved for a mistrial, claiming the judge's ruling denied Armstrong due process with regard to the presentation of a defense and would have a chilling effect on his right to testify under the Fourth, Fifth, and Fourteenth Amendments. The court found no grounds for a mistrial and denied the motion.

### 2. Disclosure Violation

¶ 54 Under Arizona Rule of Criminal Procedure 15.1(a)(2) (2003), the prosecutor must disclose "[a]ll statements of the defendant" within the prosecutor's possession or control. A "statement" is defined as, among other things, "[a] writing signed or otherwise adopted or approved by a person." Ariz. R.Crim. P. 15.4(a)(1)(i) (2003). Armstrong's apparent contention is that Eazer violated a duty to disclose Armstrong's letters to him. Armstrong mischaracterizes the prosecutorial duty.

¶ 55 Generally, "[t]he [S]tate cannot be held to disclose material that it does not possess." *State v. McDaniel*, 136 Ariz. 188, 195, 665 P.2d 70, 77 (1983). Under Rule 15.1,

the State is obliged to disclose material information not in its possession or under its control only if "(1) the [S]tate has better access to the information; (2) the defense shows that it has made a good faith effort to obtain the information without success; and (3) the information has been specifically requested by the defendant." *State v. Rienhardt,* 190 Ariz. 579, 585–86, 951 P.2d 454, 460–61 (1997).

¶.56 In *Rienhardt,* this court addressed whether letters not in the prosecutor's possession were within her control. *Id.* at 585, 951 P.2d at 460. Rienhardt was charged, *inter alia,* with first degree murder. *Id.* at 582, 951 P.2d at 457. Before trial his girlfriend entered into a plea agreement in return for her testimony against Rienhardt at trial. *Id.* at 583, 951 P.2d at 458. The prosecutor questioned her about a group of undisclosed letters she and Rienhardt had written to each other while in pretrial custody. *Id.* at 584, 951 P.2d at 459. The undisclosed letters were in the possession of the girlfriend and her lawyer. *Id.* at 586, 951 P.2d at 461.

¶ 57 On appeal, Rienhardt claimed that the State violated Arizona Rule of Criminal Procedure 15.1 by failing to obtain copies of all relevant letters and disclose them to the defense. *Id.* at 585, 951 P.2d at 460. This court found no violation of Rule 15.1 because the girlfriend was an adversary represented by counsel and Rienhardt wrote the letters in question, was aware of their contents, and could have obtained them just as easily as could the State. *Id.* at 586, 951 P.2d at 461.

¶ 58 In the instant case, the trial court relied on *Rienhardt* and found the State did not violate Rule 15.1. The record supports this finding. Medina was a codefendant, represented by counsel. Eazer was unaware of the exact nature of the contents of Armstrong's letters until Medina told her at trial. Armstrong wrote the letters and thus knew their contents. Defense counsel was aware of Armstrong's letters and chose not to question Medina about them because Armstrong had told him they were not important.

¶ 59 During one of the hearings, the judge stated that he believed "the State, while not in bad faith and not hiding anything, did not pursue a line of inquiry that was obvious, should have been obvious." Even so, Eazer had no duty to discover and disclose letters in the codefendant's possession. The State's failure to recognize the evidentiary value of letters not in its possession does not constitute a disclosure violation. Likewise, there is nothing in the record to indicate that Eazer acted in bad faith in presenting the letters.[7]

## C. Personal Attacks on the Integrity of Defense Counsel

¶ 60 Armstrong alleges that Eazer engaged in numerous "outrageous" and "inappropriate" personal attacks on defense counsel throughout pretrial and trial proceedings, and that these attacks compel reversal of his conviction. We agree that the attorneys were mutually antagonistic at times during the proceedings and we do not condone such behavior. The record before us, however, does not require reversal of Armstrong's convictions as the acrimonious conduct occurred outside the presence of the jury.

¶ 61 The criteria for determining whether remarks by a prosecutor require reversal are (1) whether the prosecutor's actions called *jurors'* attention to matters the jury was not justified in considering in determining its verdict and (2) the probability that the *jurors* were in fact influenced by the remarks. *See State v. Lee,* 189 Ariz. 608, 616, 944 P.2d 1222, 1230 (1997).

¶ 62 Taken in context, Armstrong's allegations of prosecutorial misconduct are without merit. At various times, over more than twelve months of proceedings, Eazer remarked that defense counsel distorted facts, attempted to cast the State in a bad light,

---

7. The State also contended that the invited error doctrine was applicable in this case. The doctrine exists to prevent a party from injecting error into the record and then profiting from it on appeal. *State v. Logan,* 200 Ariz. 564, 566, ¶ 11, 30 P.3d 631, 633 (2001). Because we conclude that there was no disclosure violation or bad faith, we need not address the applicability of the invited error doctrine.

played games, made "atrocious" and "disingenuous" arguments, pulled stunts, lied, made misrepresentations about his knowledge of crucial evidence, and failed to disclose such crucial evidence. The remarks were made, however, in the absence of the jury, during a handful of contentious arguments before the judge.[8]

¶ 63 The record reflects Eazer's frustration and, at times, anger with defense counsel. However, as the State points out, the record also reflects times when even the trial judge expressed frustration with defense attorney's posturing, failure to timely disclose witness lists and exhibits, misstatements of the record, and inability to set a realistic trial date. While defense counsel's questionable conduct does not justify impropriety by Eazer, it does indicate defense counsel was more than a mere onlooker in the creation of an acrimonious environment.

¶ 64 We further note that the level of antipathy between the attorneys absolutely was unacceptable. At one pretrial hearing, the court noted the following:

> I have never seen such animosity between the attorneys. It is very unhealthy for everybody. There is so much at stake ... between Ms. Eazer and Mr. Kurlander, I have not seen this ever, either as judge or a lawyer and it is not a good situation.

We share the trial judge's sentiment. Even so, we conclude the attorneys' incivility did not violate rights essential to Armstrong's

defense. Because the acrimonious and inappropriate remarks occurred outside the presence of the jury, reversal of Armstrong's convictions is not warranted.

### D. Eazer's Role in "Ex Parte" Communication with the Court

¶ 65 Armstrong claims that Eazer was instrumental in orchestrating an ex parte communication between Armstrong's mother ("Mrs. Armstrong") and the court. Specifically, Armstrong contends that Eazer violated the ethical rules when she encouraged Mrs. Armstrong to write directly to the trial judge with her criticism of Armstrong's psychological evaluation performed by Dr. Bradley Johnson, an expert for the defense. Armstrong alleges that Mrs. Armstrong acted as an agent of the State and her letter cast doubt on the expert's credibility, which resulted in prejudice in the sentencing proceedings.[9]

#### 1. Background

¶ 66 During the aggravation/mitigation phase of the trial, defense counsel submitted directly to the trial court a copy of a psychological evaluation completed by Dr. Johnson. The findings in the report were based in part on interviews with Armstrong, Medina, and Mrs. Armstrong. Eazer gave Mrs. Armstrong a copy of the report as soon as it was made a public record. Mrs. Armstrong took issue with allegations contained within the

---

8. Armstrong concedes that none of the offensive comments were made in front of the jury. Nevertheless, Armstrong contends that reversal is appropriate because the alleged attacks "were so persistent that it is hard to imagine they did not have some effect on the trial court's rulings." For support, Armstrong cites *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). However, in *Berger* the Supreme Court found reversal of defendant's conviction was justified because the prosecutor's pronounced and persistent misconduct "had a probable cumulative *effect upon the jury*" which cannot be disregarded as inconsequential." *Id.* at 89, 55 S.Ct. 629 (emphasis added). *Berger* does not support Armstrong's argument as there was no probable cumulative effect because no juror was made aware of the alleged misconduct.

The State admits that at one point, in front of the jury, Eazer unintentionally expressed disapproval of defense counsel's opening statement

through her body language and facial expressions. The court admonished Eazer and offered defense counsel the opportunity to make an objection on the issue, but defense counsel decided to let it go and move on. The record does not indicate that this single incident affected the jury's verdict or deprived Armstrong of a fair trial.

9. We conclude in the Supplemental Opinion that follows that because Armstrong's sentencing was done by the trial judge and not the jury, *Ring II* error was committed in the sentencing proceedings. As a result, Armstrong's case will be remanded for re-sentencing. It would appear, then, that whether prosecutorial misconduct tainted the sentencing proceedings is irrelevant at this point. However, because Armstrong makes a "cumulative effect" argument, we address each alleged incident even though individual incidents of misconduct do not rise to a level requiring mistrial.

report, especially Armstrong's reported incidents of emotional and physical abuse, including sexual molestation.

¶ 67 Mrs. Armstrong spoke to Eazer about her concerns and asked if she could write a letter saying that the reports were not true. Eazer assured Mrs. Armstrong that, as a main victim in the case, she was entitled to write a letter to the judge and ask that her views be made part of the record. Eazer told Mrs. Armstrong she could write the letter directly to the judge, or she could send it to her, the prosecutor, who would then disclose it to the judge and the parties.

¶ 68 Mrs. Armstrong submitted a cover letter and a copy of Dr. Johnson's report with her handwritten comments "in lieu of a victim [impact] statement" directly to the court. She noted three issues she hoped to cover in her statement: the impact the crime had on her family, corrections that needed to be made to Dr. Johnson's report, and the sentence Armstrong should receive.

¶ 69 During the second day of Dr. Johnson's testimony at the aggravation/mitigation hearing, Eazer questioned Dr. Johnson as to whether Mrs. Armstrong had contested Armstrong's report that he was molested as a child. Dr. Johnson admitted that Mrs. Armstrong took issue with the allegations. Eazer then commented to the court that Mrs. Armstrong would be sending the court, with a copy for counsel, a statement of those things she felt were incorrect in the psychological report. The judge replied that he had already received and read Mrs. Armstrong's statement. He assumed the letter had come through the County Attorney and had been disclosed to defense counsel. He stated that

the statement would have no impact on what happened in the aggravation/mitigation proceedings.

¶ 70 Defense counsel moved to change the judge for cause under Arizona Rule of Criminal Procedure 10.1, contending that it was improper for the trier of fact to have outside input regarding the credibility of his expert. The following day a hearing was held before Judge Gordon Alley on the defense's motion. Based on the parties' arguments, the pleadings, and the relevant transcripts, Judge Alley found that Armstrong had failed to meet his burden of proving prejudice on the part of the trial judge and denied the motion.

### 2. Alleged Prosecutorial Misconduct

¶ 71 Armstrong contends that Eazer violated numerous ethical rules when she advised Mrs. Armstrong she could send a letter to the court outlining her concerns about Dr. Johnson's report. Armstrong claims that Mrs. Armstrong's associations with Eazer essentially made her an agent of the State and allowed Eazer to do what she could not ethically and legally do herself.

¶ 72 Armstrong's allegations of prosecutorial misconduct in instigating an ex parte communication are meritless. First, Armstrong fails to explain how the ethical rules "give guidance" in deciding whether a prosecutor engaged in misconduct.[10] Second, Armstrong fails to cite any case law supporting his contention that a victim or witness becomes an agent of the State when she communicates with the court. In fact, this court has explicitly held that the cooperation of a victim or witness "does not render her an agent of the prosecutor's office." *Rien-*

---

10. Armstrong cites Arizona Rule of the Supreme Court 42, Ethical Rules ("E.R.s") 3.5, 3.6, and 3.8. E.R. 3.5 provides that "[a] lawyer shall not: (a) seek to influence a judge ... by means prohibited by law; (b) communicate ex parte with such a person except as permitted by law; or (c) engage in conduct intended to disrupt a tribunal." Ariz. R. Sup.Ct. 42, E.R. 3.5 (2003). There is no evidence that Eazer engaged in any such conduct.

E.R. 3.6 provides that "[a] lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will

have a substantial likelihood of materially prejudicing an adjudicative proceeding." Ariz. R. Sup.Ct. 42, E.R. 3.6 (2003). E.R. 3.8 extends the duty of the prosecutor to "exercise reasonable care to prevent ... persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under ER 3.6." Ariz. R. Sup.Ct. 42, E.R. 3.8 (2003). Again, there is no evidence or even allegation that Eazer or anyone "assisting or associated with [her]" made extrajudicial statements to the press.

Armstrong has not proven that Eazer violated any ethical rule.

*hardt,* 190 Ariz. at 585, 951 P.2d at 460 (witness); *State v. Piper,* 113 Ariz. 390, 392, 555 P.2d 636, 638 (1976) (victim). Further, nothing in the record supports Armstrong's contention that Eazer *instigated* Mrs. Armstrong's communication with the court. *Cf. Rienhardt,* 190 Ariz. at 585, 951 P.2d at 460 ("[T]he fact that the prosecution is in a better position to secure a witness's cooperation [does not] mean that the witness is under the prosecution's control."). As a result, we find that Eazer acted appropriately in her communications with Mrs. Armstrong.

### E. Cumulative Effects of Purported Prosecutorial Misconduct

¶ 73 Armstrong finally contends that prosecutorial misconduct was so pervasive in this case as to deny him his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 2, Section 24, of the Arizona Constitution. Armstrong cites *State v. Hughes,* 193 Ariz. 72, 969 P.2d 1184 (1998), to support his contention that repeated acts of prosecutorial misconduct may deny a defendant a fair trial, even though individual incidents of misconduct may not rise to a level requiring mistrial. However, because we find no prosecutorial misconduct, it follows that there can be no cumulative effect of such alleged misconduct.

### CONCLUSION

¶ 74 In conclusion, Armstrong's claim of prosecutorial misconduct is without foundation. Therefore, because Armstrong received a fair trial, his convictions on all three counts are affirmed.

¶ 75 This Opinion addresses only those issues pertaining to Armstrong's convictions as determined during the guilt phase of the trial in the Superior Court. A Supplemental Opinion addressing Armstrong's sentencing will follow simultaneously.

CONCURRING: RUTH V. McGREGOR, Vice Chief Justice, REBECCA WHITE BERCH and MICHAEL D. RYAN, Justices and CECIL B. PATTERSON, Jr., Judge, Retired.

Justice ANDREW D. HURWITZ has recused in this matter; in his stead, Honorable CECIL B. PATTERSON, JR., Judge, retired, from the Arizona Court of Appeals, Division One, was designated to sit in his place pursuant to Article 6, Section 3, of the Arizona Constitution.